IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MACKENZIE B.,[1]                                    Case No. 3:25-cv-01088-SB

         Plaintiff,                            **OPINION AND ORDER**

    v.

COMMISSIONER SOCIAL SECURITY
ADMINISTRATION,

         Defendant.

**BECKERMAN, U.S. Magistrate Judge.**

Mackenzie B. ("Plaintiff") filed this appeal challenging the Commissioner of Social Security's ("Commissioner") denial of her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons explained below, the Court affirms the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party.

PAGE 1 – OPINION AND ORDER

**STANDARD OF REVIEW**

"As with other agency decisions, federal court review of social security determinations is limited." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). A federal court's review is limited because "[f]or highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)). Adhering to this principle, courts "follow three important rules" in reviewing social security determinations. *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).

First, courts "leave it to the [agency] to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Id.* (quoting *Treichler*, 775 F.3d at 1098). Second, courts "will 'disturb the Commissioner's decision to deny benefits only if it is not supported by substantial evidence or is based on legal error.'" *Id.* (quoting *Treichler*, 775 F.3d at 1098). Third, if the agency "'commits legal error, [courts] uphold the decision where that error is harmless,' meaning that 'it is inconsequential to the ultimate nondisability determination,' or that, despite the legal error, 'the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity.'" *Id.* (quoting *Treichler*, 775 F.3d at 1098); *see also Smith v. Kijakazi*, 14 F.4th 1108, 1111 (9th Cir. 2021) ("And even where this modest [substantial evidence] burden is not met, [courts] will not reverse an [agency] decision where the error was harmless." (citing *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012), *superseded on other grounds by regulation as recognized in Farlow v. Kijakazi*, 53 F.4th 485, 487 (9th Cir. 2022))).

///

PAGE 2 – OPINION AND ORDER

**BACKGROUND**

I.    **PLAINTIFF'S APPLICATION**

Plaintiff was born in March 1996, making her twenty-six years old on April 20, 2022, the day that she filed her SSI application and her amended alleged disability onset date.[2] (Tr. 40, 111, 168, 178.) Plaintiff is a college graduate who has no past relevant work experience. (*Id.* at 40, 115, 117, 325.) In her application, Plaintiff alleges disability due primarily to Ehlers-Danlos syndrome,[3] back and joint pain, gastrointestinal issues, anxiety, and depression. (*Id.* at 112-14, 168, 178.)

The Commissioner denied Plaintiff's application initially and upon reconsideration, and on January 3, 2024, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 21.) On June 13, 2024, Plaintiff and an impartial vocational expert ("VE") appeared and testified at an administrative hearing held before an ALJ. (*Id.* at 110-34.) On July 24, 2024, the ALJ issued a written decision denying Plaintiff's application. (*Id.* at 21-41.) On April 30, 2025, the Appeals Council denied Plaintiff's request for review, making the ALJ's written decision the final decision of the Commissioner. (*Id.* at 1-6.) Plaintiff now seeks judicial review of that decision.

---

[2] Although a claimant's "complete medical history (i.e., records of a claimant's medical sources covering at least the [twelve] months preceding the month in which an application is filed) must be considered for purposes of his application, . . . SSI benefits are not payable prior to the month following the month in which the application was filed[.]" *Pineda v. Comm'r of Soc. Sec.*, No. 1:22-cv-01287-SAB, 2023 WL 5334984, at *1 n.3 (E.D. Cal. Aug. 18, 2023) (citing 20 C.F.R. §§ 416.335, 416.912). Thus, in evaluating an SSI application, an ALJ's disability determination turns on whether the claimant was disabled "as of the date the application was filed." *Id.*

[3] Ehlers-Danlos Syndrome is a "rare genetic condition typified by joint instability and chronic musculoskeletal pain." *Allen v. Berryhill*, No. 3:16-cv-02067-SB, 2017 WL 5297945, at *1 (D. Or. Nov. 13, 2017) (quoting *Wong v. Minn. Dep't of Hum. Servs.*, 820 F.3d 922, 926 (8th Cir. 2016)).

## II.    THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than [twelve] months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant can perform other work that exists in significant numbers in the national economy. *Id.* at 724-25.

To establish a "prima facie case of a disability," a claimant must demonstrate "at steps one through four of the sequential evaluation process that she suffers from a severe impairment that prevents her from doing any work she has done in the past, or that she has a severe impairment and has no relevant past work[.]" *White v. Kjakazi*, 44 F.4th 828, 833 (9th Cir. 2022) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). If the claimant does so, "[t]he burden then shifts to the Commissioner at step five to establish that the claimant can perform a 'significant number[]' of jobs in the national economy given the claimant's physical and mental limitations, age, education, and work experience." *Id.* (first quoting 20 C.F.R. § 416.960(c)(2); and then citing *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002)). "If the Commissioner meets [his] burden, the claimant has failed to establish disability." *Thomas*, 278 F.3d at 955 (simplified).

///

PAGE 4 – OPINION AND ORDER

### III.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 21-41.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 20, 2022, the day that she filed her application and her amended alleged disability onset date. (*Id.* at 21, 23, 111.) At step two, the ALJ concluded that Plaintiff suffered from the following severe, medically determinable impairments: "[L]umbar and thoracic degenerative disc disease, Scheuermann's disease, tendinitis, Ehlers Danlos syndrome, obesity, mood disorder, bipolar disorder, [and] anxiety[.]" (*Id.* at 23.) At step three, the ALJ determined that Plaintiff did not have an impairment that meets or medically equals a listed impairment. (*Id.* at 24.)

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work, subject to these limitations: (1) Plaintiff can frequently kneel, crouch, crawl, climb ramps, stairs, ladders, ropes, and scaffolds, and handle and finger with her bilateral upper extremities, (2) Plaintiff can occasionally interact with supervisors, coworkers, and the public, (3) Plaintiff can carry out simple instructions, and (4) Plaintiff cannot be exposed to unprotected heights and moving mechanical parts. (*Id.* at 27.) At step four, the ALJ concluded that Plaintiff has no past relevant work experience. (*Id.* at 40.) Finally, at step five, the ALJ found that Plaintiff was not disabled because a significant number of jobs existed in the national economy that she could perform, including work as a routing clerk, housekeeping cleaner, and collator operator. (*Id.*)

### DISCUSSION

Plaintiff raises two principal issues on appeal: (1) whether substantial evidence supports the ALJ's discounting of the opinions from Plaintiff's treating nurse practitioner, Leah Jacobs ("NP Jacobs"), and (2) whether the ALJ failed to provide specific, clear, and convincing reasons

PAGE 5 – OPINION AND ORDER

for discounting Plaintiff's symptom testimony. (*See* Pl.'s Opening Br. at 5-6, 8-12, 16, 19, ECF No. 11, raising these issues after detailing the standards, evidence, and findings "at issue") (simplified). As explained below, the Court concludes that the ALJ's decision is free of harmful legal error and supported by substantial evidence and therefore affirms the Commissioner's decision.

## I.    THRESHOLD ISSUES

Before turning to the specific reasons that the ALJ provided for discounting NP Jacobs' opinions and Plaintiff's symptom testimony, the Court must briefly address Plaintiff's argument that the ALJ's analysis of this evidence suffers from "two global defects," either of which is independently sufficient to warrant a remand for further proceedings. (Pl.'s Opening Br. at 12-14.)

First, Plaintiff suggests that the ALJ's analysis of her testimony and NP Jacobs' opinions is flawed because it amounts to nothing more than a summary of the record evidence and conclusory statements that are beyond meaningful judicial review. (*Id.* at 10-12.) The Court disagrees.

It is correct that Ninth Circuit precedent "demand[s] that the agency set forth the reasoning behind its decisions in a way that allows for meaningful review." *Brown-Hunter*, 806 F.3d at 492. The Ninth Circuit requires such reasoning because without it, "a reviewing court [is] . . . unable to review [the ALJ's] reasons meaningfully without improperly 'substituting [its] conclusions for the ALJ's, or speculating as to the grounds for the ALJ's conclusions.'" *Id.* (simplified) (quoting *Treichler*, 775 F.3d at 1103); *see also Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) (explaining that ALJs "must provide sufficient reasoning that allows [federal courts] to perform [their] own review, because 'the grounds upon which an administrative order

PAGE 6 – OPINION AND ORDER

must be judged are those upon which the record discloses that its action was based'" (quoting *Treichler*, 775 F.3d at 1102)).

As discussed further below, *see infra* Parts II.B. & III.B., the ALJ not only summarized the longitudinal record, but also provided specific reasons (often accompanied by pin cites to supporting evidence) for discounting particular parts of NP Jacobs' opinions and Plaintiff's symptom testimony. (*See, e.g.*, Tr. 28-36, evaluating Plaintiff's testimony and medical evidence regarding her physical and mental impairments; *id.* at 36-39, evaluating NP Jacobs' and other providers' medical opinions in a comparable manner). Notably, Plaintiff effectively concedes as much by (1) arguing that the ALJ's analysis was too conclusory to permit meaningful judicial review before "turn[ing] to the more specific statements the ALJ made regarding . . . Jacobs' opinion[s] and Plaintiff's statements," and (2) declining to challenge the ALJ's "mental RFC findings," which relate both to Plaintiff's symptom testimony and NP Jacobs' opinions. (*See* Tr. 34-36, 38-39, evaluating Plaintiff's symptom testimony and medical opinion evidence regarding Plaintiff's mental impairments and limitations; *see also id.* at 2047, reflecting that NP Jacobs opined that "emotional factors contribute to the severity of [Plaintiff's] symptoms and functional limitations," that Plaintiff's "psychological conditions," i.e., anxiety, bipolar, and somatoform disorders,[4] "affect[] . . . [her] physical condition," and that Plaintiff's "pain or other symptoms" are "severe enough" to "[f]requently" "interfere with [her] attention and concentration") (simplified).

Accordingly, the ALJ's reasoning is sufficient to permit a meaningful review of his decision.

---

[4] "A somatoform disorder is a psychosomatic illness: one has physical symptoms, but there is no physical cause." *Baptist v. Kijakazi*, 74 F.4th 437, 440 n.2 (7th Cir. 2023) (simplified).

PAGE 7 – OPINION AND ORDER

The second "global defect" that Plaintiff identifies is the ALJ's purported reliance on his own "lay analysis of raw medical data." (Pl.'s Opening Br. at 12.) Here, too, Plaintiff's argument fails.

An "ALJ is responsible for studying the record and resolving any conflicts or ambiguities in it." *Diedrich v. Berryhill*, 874 F.3d 634, 638 (9th Cir. 2017); *see also Slayton v. O'Malley*, No. 22-16883, 2024 WL 637482, at *1 (9th Cir. Feb. 15, 2024) ("The ALJ 'is charged with determining credibility and resolving . . . conflict[s]' between medical evidence." (quoting *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012))). An ALJ is also "responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015); *cf. Floe v. O'Malley*, No. 23-35589, 2024 WL 4601594, at *1 (9th Cir. Oct. 29, 2024) ("The ALJ found each medical opinion persuasive and appropriately translated the assessments of [the claimant's] moderate mental impairments into the [RFC.]" (citing *Rounds*, 807 F.3d at 1006)). Thus, "[i]nherent in the standard for evaluation of medical evidence is a presumption that ALJs are, at some level, capable of independently reviewing and forming conclusions about medical evidence." *Hardin v. Kijakazi*, No. 22-16517, 2023 WL 6567890, at *3 (9th Cir. Oct. 10, 2023) (simplified) (quoting *Farlow*, 53 F.4th at 488).

Consistent with these authorities, the Court rejects Plaintiff's argument that the ALJ's evaluation of NP Jacobs' opinions represented an improper lay assessment of medical evidence. (*See* Pl.'s Opening Br. at 12-14; *cf.* Tr. 37-38, evaluating NP Jacobs' opinions). In support of this argument, Plaintiff emphasizes that the state agency medical consultants' opinions, which the ALJ found more persuasive than NP Jacobs' opinions and Plaintiff does not challenge on appeal, failed to address NP Jacobs' April 2023 opinion and predated NP Jacobs' May 2024 opinion by five months. (*See* Pl.'s Opening Br. at 13; *cf.* Tr. 36-38, finding the state agency medical

PAGE 8 – OPINION AND ORDER

consultants' opinions "partially persuasive" and "generally consistent with the overall record, including the imaging studies, physical examination findings, and treatment history discussed earlier"; *see also* Tr. 168-76, 178-86, 1380-83, 2046-49, attaching the state agency consultants' opinions dated April 11 and December 18, 2023 and NP Jacobs' opinions dated April 28, 2023 and May 13, 2024). Plaintiff, however, fails adequately to explain why such facts establish that the ALJ offered only a lay assessment of NP Jacobs' medical opinion evidence, as opposed to resolving conflicts or ambiguities in the record and evaluating NP Jacobs' opinions in accordance with applicable regulations.

Furthermore, the ALJ's reasons for finding NP Jacobs' opinions unpersuasive, *see infra* Part II.B.2., do not support a conclusion that the ALJ relied on a lay assessment of NP Jacobs' opinions and treatment records or exceeded what is "inherent in the standard for evaluation of medical evidence." *Hardin*, 2023 WL 6567890, at *3. Thus, the Court declines to find that Plaintiff's second "global defect" warrants a remand for further proceedings.

## II.    MEDICAL OPINION EVIDENCE

### A.    Applicable Law

"In January 2017, the Social Security Administration issued revised regulations for evaluating medical opinions relating to claims filed on or after March 27, 2017."[5] *Cross v. O'Malley*, 89 F.4th 1211, 1214 (9th Cir. 2024) (citing Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (codified at 20 C.F.R. pts. 404 & 416)). The revised "regulations provide that ALJs will no longer 'defer or give any specific evidentiary weight' to any medical opinion." *Id.* (quoting 20 C.F.R. § 416.920c(a)).

_____

[5] The parties agree the revised regulations apply because Plaintiff filed her application after March 27, 2017. (*See* Pl.'s Opening Br. at 5 & Def.'s Br. at 14, ECF No. 14, describing the standard).

PAGE 9 – OPINION AND ORDER

Instead, "ALJ[s] must assess the persuasiveness of each medical opinion after considering specified factors." *Stiffler v. O'Malley*, 102 F.4th 1102, 1106 (9th Cir. 2024) (first citing *Woods v. Kijakazi*, 32 F.4th 785, 791-92 (9th Cir. 2022); and then citing 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(b)).

Specifically, the revised "regulations require an ALJ to discuss the supportability and consistency of medical evidence—the factors the agency has historically found to be the most important in evaluating medical opinions—while allowing for discussion of other factors listed in paragraphs (c)(3) through (c)(5), as appropriate." *Cross*, 89 F.4th at 1215 (citing 20 C.F.R. § 416.920c(a)); *see also Woods*, 32 F.4th at 791 ("'The most important factors' that the agency considers when evaluating the persuasiveness of medical opinions are 'supportability' and 'consistency.'" (quoting 20 C.F.R. § 404.1520c(a))). "Supportability focuses on whether 'a medical source supports a medical opinion by explaining the relevant objective medical evidence.'" *Stiffler*, 102 F.4th at 1106 (quoting *Woods*, 32 F.4th at 791-92); *see also Kitchen v. Kijakazi*, 82 F.4th 732, 740 (9th Cir. 2023) ("Supportability concerns how 'a medical source supports a medical opinion' with relevant evidence[.]" (quoting *Woods*, 32 F.4th at 791-92)). "Consistency means the extent to which a medical opinion is consistent with the evidence from other medical sources and nonmedical sources[.]" *Stiffler*, 102 F.4th at 1106 (quoting *Woods*, 32 F.4th at 792).

In addition to supportability and consistency, "[a]n ALJ may discuss other factors [listed in paragraphs (c)(3) through (c)(5)], such as the medical source's 'relationship with the claimant' or 'specialization,' but generally has no obligation to do so." *Cross*, 89 F.4th at 1214 (citing 20 C.F.R. § 416.920c(b)(2)). If, however, an ALJ concludes that "two or more contradictory medical opinions 'both equally well-supported . . . and consistent with the record[,]' . . . the regulations

PAGE 10 – OPINION AND ORDER

mandate discussion of these other factors." *Id.* at 1214-15 (quoting 20 C.F.R. § 416.920c(b)(3), (c)(3)-(5)).

Where, as here, the new regulations apply, a district court reviews the ALJ's evaluation of a medical opinion for substantial evidence. *See Woods*, 32 F.4th at 787 ("For claims subject to the new regulations, . . . an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence."); *id.* at 792 ("Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."); *Metcalf v. Kijakazi*, No. 22-35201, 2022 WL 17592194, at *1 (9th Cir. Dec. 13, 2022) (observing that "under the revised regulations . . . , the ALJ's evaluation of a medical opinion is reviewed for substantial evidence" (citing *Woods*, 32 F.4th at 789)); *see also Stiffler*, 102 F.4th at 1108 ("In sum, the ALJ's evaluation of [the physician's] medical opinion is supported by substantial evidence.").

**B.      Analysis**

Plaintiff argues that the ALJ erred in discounting NP Jacobs' opinions. (Pl.'s Opening Br. at 12-14.) The Court disagrees and finds that substantial evidence supports the ALJ's evaluation of NP Jacobs' opinions. *See generally Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) ("[T]he threshold for [substantial] evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019))).

**1.      NP Jacobs' Opinions**

On April 28, 2023, NP Jacobs completed an initial medical source statement in support of Plaintiff's application for benefits. (*See* Tr. 1380-83.) NP Jacobs reported that Plaintiff carried

PAGE 11 – OPINION AND ORDER

diagnoses of bipolar affective disorder, Scheuermann's disease,[6] and Ehlers-Danlos Syndrome, a "connective tissue disease" that affects Plaintiffs' joint, muscle, digestive, and gynecologic systems and causes Plaintiff to suffer from malaise and severe fatigue. (*Id.* at 1380-81.) NP Jacobs also opined that Plaintiff suffered from moderate to marked limitations in activities of daily living (e.g., marked limitations in terms of shopping and "chores" and moderate limitations in terms of cooking, bathing, and transportation) and marked limitations in persistence and pace. (*Id.*)

NP Jacobs further opined that because of Plaintiff's "difficulties persisting with tasks and maintaining work pace/efficiency," she expected Plaintiff to be less than fifty percent as efficient as an average worker performing full-time work on a sustained basis. (*Id.* at 1381.) NP Jacobs also opined that (1) Plaintiff suffers from no deficits in concentration or following instructions, (2) Plaintiff's limitations would preclude simple work tasks for no more than five percent of an eight-hour workday, (3) Plaintiff "need[s] an assistive device to ambulate" and therefore "uses a cane," (4) Plaintiff can only walk a block without needing to rest or experiencing "severe pain," (5) Plaintiff needs to sit or lie down after standing for ten minutes, (6) Plaintiff can stand and walk for less than two hours during an eight-hour workday, (7) Plaintiff would need more than ten unscheduled breaks of "at least ten minutes duration" during an eight-hour workday, and (8) Plaintiff's impairments and treatment would cause her to miss more than four workdays per month. (*Id.* at 1382.)

///

---

[6] "Scheuermann's disease is a condition of the vertebrae associated with pain and kyphosis of the spine, which is abnormal curvature of the spine." *Smith v. Astrue*, No. 12-cv-05376, 2013 WL 427937, at *1 n.1 (W.D. Wash. Jan. 14, 2013) (citation omitted), *report and recommendation adopted*, 2013 WL 427936, at *1 (W.D. Wash. Feb. 4, 2013).

PAGE 12 – OPINION AND ORDER

On May 13, 2024, NP Jacobs completed an updated medical source statement in support of Plaintiff's application for benefits. (*Id.* at 2046-49.) NP Jacobs noted that she had served as Plaintiff's primary care provider since 2012, provided "med[ication] management" four to six times per year, and considered Plaintiff's bipolar disorder, Scheuermann's disease, and Ehlers-Danlos Syndrome to be "chronic" conditions. (*Id.* at 2046.) With respect to clinical findings and objective support for her opinions, NP Jacobs noted that Plaintiff's Scheuermann's disease diagnosis was based on x-rays and genetic testing "confirm[ed]" Plaintiff's Ehlers-Danlos Syndrome diagnosis. (*Id.*)

Notably, NP Jacobs explained that unspecified emotional factors contribute to the severity of Plaintiff's symptoms and functional limitations, Plaintiff's psychological conditions (i.e., anxiety, bipolar, and somatoform disorders) affect her physical condition, and Plaintiff's "impairments (physical impairments plus any emotional impairments) [are] reasonably consistent with the symptoms and functional limitations described" in NP Jacobs' opinion. (*Id.* at 2047.) NP Jacobs also reiterated that Plaintiff can walk a block before needing to rest and stand and walk for less than two hours during an eight-hour workday and would need more than ten unscheduled breaks, which on average last five minutes, during an eight-hour workday. (*Id.* at 2047-48.)

NP Jacobs added that Plaintiff's impairments are "likely to produce 'good days' and 'bad days'" and that on average, Plaintiff's impairments or treatment would cause her to be absent from work more three times per month. (*Id.* at 2048.) With respect to whether Plaintiff "must . . . use a cane or other assistive device," NP Jacobs did not check the space corresponding to "[y]es" or "[n]o" and instead noted that Plaintiff "uses a cane on occasion of flare ups." (*Id.*) Finally, unlike her initial medical source statement, NP Jacobs opined that Plaintiff's "experience

PAGE 13 – OPINION AND ORDER

of pain or other symptoms" would "[f]requently" interfere with her "attention and concentration." (*Id.* at 2047.)

### 2.      The ALJ's Decision

The ALJ explained that he "carefully considered" NP Jacobs' opinions but found them unpersuasive. (*Id.* at 37.) The ALJ provided "several reasons" in support of this finding. (*Id.* at 37-38.)

First, after recognizing multiple times that NP Jacobs was Plaintiff's "primary care provider" (*id.* at 24, 31, 37), the ALJ explained that he found NP Jacobs' opinions unpersuasive because she essentially expressed them in "check-box forms" with "only limited explanation[s]" regarding the "medical or other evidence" upon which she based her opinions. (*Id.* at 37.) Relatedly, the ALJ also explained that he found NP Jacobs' opinions unpersuasive because her "own treatment records" consisted of "largely unremarkable examination findings" and thus failed adequately to support her opinions. (*Id.*) By way of example, the ALJ noted that three months before completing her May 2024 opinion, NP Jacobs reported only that Plaintiff "presented for the purpose of referral orders for disability," appeared to be in "no acute distress," and "did not [exhibit] any abnormal physical findings other than obesity at that time."[7] (*Id.*, citing Ex. B10F at 34, i.e., Tr. 1918.)

The ALJ also explained that he found NP Jacobs' opinions unpersuasive because they contained internal inconsistencies regarding Plaintiff's ability to walk and the necessity of Plaintiff's use of an assisted device. (*Id.*) To that end, the ALJ stated that although NP Jacobs previously opined that Plaintiff "needed a cane to ambulate," she subsequently reported that

---

[7] In her treatment note dated January 9, 2024, NP Jacobs also recommended that Plaintiff set a goal of performing ten minutes of "increased activity three times a day" and do so by walking, "walking up and down stairs," or "marching in place while [she] watch[es] a [television] show." (Tr. 1920.)

PAGE 14 – OPINION AND ORDER

Plaintiff "only used a cane on occasion of flare ups." (*Id.*; *cf. id.* at 1382, 2048, questions 7.A.5. and 15.H.)

Furthermore, the ALJ explained that he found NP Jacobs' opinions unpersuasive because they were "not fully consistent with the overall record." (*Id.*) In support of this finding, the ALJ observed that NP Jacobs completed her "most recent" medical source statement around the time that Plaintiffs' other medical providers' examinations revealed that Plaintiff exhibited "some pain with range of motion in her lumbar spine" but also "unremarkable motor activity, no issues with gait, [and] no gross motor deficit." (*Id.* at 37-38, citing Ex. B10F at 10-11, 16-17, 31, 43 & Ex. B11F at 3, i.e., Tr. 1894-95, 1900-01, 1915, 1924, 1987; *see also id.* at 1894-95, February 23, 2024, focusing on mental impairments; *id.* at 1900-01, February 20, 2024, exhibiting pain, tenderness, and decreased range of motion in the lumbar and thoracic regions, a normal gait, normal hip range of motion, strength, and function, and negative bilateral straight leg raise and FABER tests;[8] *id.* at 1915, January 11, 2024, noting that a twelve-point review of Plaintiff's systems was "negative" in nearly all respects and Plaintiff appeared in "no acute distress"; *id.* at 1924, November 22, 2023, documenting "unremarkable" motor activity and tandem gait; *id.* at 1987-88, March 18, 2024, presenting for the first time in more than three years, using a cane, wearing wrist and "knee braces bilaterally," appearing in "no acute distress while sitting" but having a "difficult time getting on the examination table," and exhibiting normal reflexes and "reasonably good motion" and only "[m]ild decreased strength in all joints," which reportedly "hurt").

///

---

[8] A physician performs a "FABER" test by "appl[ying] pressure to the knee while the hip is flexed abducted and externally rotated (FABER) to test for pain." *Macina v. Colvin*, No. 24-204, 2024 WL 5116300, at *3 n.2 (9th Cir. Dec. 16, 2024).

PAGE 15 – OPINION AND ORDER

Finally, the ALJ explained that he found NP Jacobs' opinions unpersuasive because she is a "general practitioner and not a relevant specialist" (i.e., connective tissue disorders, etc.). (*See id.* at 38; *cf.* Tr. 1380, completing a "Connective Tissue Disorder Medical Assessment Form") (simplified).

### 3.    Disposition

Plaintiff argues that the ALJ erred in discounting NP Jacobs' opinions. (Pl.'s Opening Br. at 14-16.) The Court disagrees.

Under the revised regulations, an "ALJ 'must articulate how persuasive [he] finds all of the medical opinions from each doctor or other source, and explain how [he] considered the supportability and consistency factors in reaching these findings.'" *Stiffler*, 102 F.4th at 1106 (quoting *Woods*, 32 F.4th at 792). Consistency concerns the extent to which a "medical opinion is consistent with the evidence from other medical and nonmedical sources," *Kitchen*, 82 F.4th at 740 (quoting *Woods*, 32 F.4th at 792), and "[s]upportability focuses on whether 'a medical source supports a medical opinion by explaining the relevant objective medical evidence.'" *Stiffler*, 102 F.4th at 1106 (quoting *Woods*, 32 F.4th at 791-92); *cf. Kitchen*, 82 F.4th at 740 ("Supportability concerns how 'a medical source supports a medical opinion' with relevant evidence.") (simplified).

Applying these standards, the Court concludes that substantial evidence supports the ALJ's discounting of NP Jacobs' opinions. It is well established that an ALJ may reject a medical opinion "provided on a check-box form 'with little to no explanation,' . . . or that lacks support in the record as a whole[.]" *Pickett v. King*, No. 23-16192, 2024 WL 5398771, at *2 (9th Cir. Feb. 10, 2025) (first quoting *Kitchen*, 82 F.4th at 741-42; and then citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004)); *cf. Garrison v. Colvin*, 759 F.3d 995, 1013 (9th Cir. 2014) (distinguishing medical opinions that are "expressed in check-box form," "based

PAGE 16 – OPINION AND ORDER

on significant experience" with the claimant, and "supported by numerous records" and medical opinions that are "entitled to [less] weight" because they are expressed in "check-box form" and "otherwise unsupported and unexplained"). Consistent with these authorities, the ALJ recognized that NP Jacobs was Plaintiff's "primary care provider" but nevertheless discounted NP Jacobs' opinions because she expressed them in "check-box forms" and offered "only limited explanation[s]" regarding the "medical or other evidence" upon which she based her opinions and her treatment records and findings did not support the extreme work limitations that she identified. (Tr. 24, 31, 37.)

Plaintiff concedes that it "would be accurate to state that [NP Jacobs'] 2023 opinion was not a fulsome explanation." (Pl.'s Opening Br. at 14.) Plaintiff nevertheless argues that NP Jacobs "more than made up" for this shortcoming because her 2024 opinion contained "quite a bit more in terms of explanation" and the record included her treatment records and findings. (*Cf.* Tr. 1380-83, setting forth NP Jacobs' April 2023 opinion; Tr. 2046-49, attaching NP Jacobs' May 2024 opinion). With respect to the ALJ's related finding that NP Jacobs' opinions are otherwise unsupported by her own treatment records, Plaintiff simply argues that the ALJ relied on a lay assessment of NP Jacobs' "raw medical data." (Pl.'s Opening Br. at 15.) After making this argument, Plaintiff emphasizes only that she is not required to "provide evidence that [her] impairment would result in the same degree of pain or other symptom as to what [she] . . . alleges," suggesting that the "raw medical data" upon which NP Jacobs relied is Plaintiff's own self-reports. (*Id.*, citing *Garrison*, 759 F.3d at 1014.)

As discussed above, *see supra* Part I., Plaintiff fails adequately to explain why any of the ALJ's findings constitute a lay assessment of NP Jacobs' medical opinion evidence. The ALJ's analysis appears only to support the conclusion that he resolved conflicts or ambiguities in the

PAGE 17 – OPINION AND ORDER

record and evaluated NP Jacobs' opinions in accordance with the revised regulations. *See generally Hardin*, 2023 WL 6567890, at *3 ("Inherent in the standard for evaluation of medical evidence is a presumption that ALJs are, at some level, capable of independently reviewing and forming conclusions about medical evidence." (simplified) (quoting *Farlow*, 53 F.4th at 488)). To the extent that Plaintiff relies on her own testimony, the Court finds Plaintiff's argument unpersuasive because, as explained below, the ALJ was entitled to assess Plaintiff's testimony and provided clear and convincing reasons, supported by substantial evidence in the record, for discounting it.

Even setting these points aside, substantial evidence supports the ALJ's finding that NP Jacobs' opinions are entitled to less weight because they are otherwise unsupported and inadequately explained. *Cf. Garrison*, 759 F.3d at 1013 (distinguishing such an opinion from one "based on significant experience" with the claimant and "supported by numerous records"); *Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (explaining that a physician's assessments were in "'check-box' form and contain[ed] almost no detail or explanation" but the "record support[ed] [the] opinions because they [were] consistent both with [the c]laimant's testimony at the hearing and with [the physician's] own extensive treatment notes[,] which . . . the ALJ largely overlooked"). Notably, in the May 2024 opinion upon which Plaintiff relies, NP Jacobs provided only a limited response to a question regarding Plaintiff's "treatment and response including," but not limited to, "any side effects of medication" (i.e., NP Jacobs addressed only medication side effects and suggested that Plaintiff's four to six visits "per year [were] for med[ication] management"). (Tr. 2046.) NP Jacobs also failed to: (1) "characterize the nature, location, frequency, precipitating factors, and severity of . . .[Plaintiff's] pain," which Plaintiff described as severely debilitating, (2) estimate how long Plaintiff could "continuously sit and stand at one

PAGE 18 – OPINION AND ORDER

time," (3) provide a "[y]es" or "[n]o" answer as to whether Plaintiff "must . . . use a cane or other assistive device," and (4) "describe any other limitations (such as psychological limitations, . . . etc.) that would affect [Plaintiff's] ability to work at a regular job on a sustained basis[.]"[9] (*Id.* at 2046-49; *see also id.* at 113, demonstrating that Plaintiff testified at the hearing before the ALJ that her chronic pain causes her to lie on her "back in [a] recliner, unable to push any further, staring up at the ceiling, unmoving, [with] tears running down [her] face that [she is] unable to wipe away"; *id.* at 34, finding that Plaintiff "made little, if any, mention to her pain clinic providers of pain at such an intensity that she could not even lift a hand to wipe her tears[,] as she testified to at the hearing").

Given these facts, substantial evidence supports the ALJ's findings that NP Jacobs' opinions were in check-box forms that lacked an adequate explanation and unsupported by her treatment records. *See Ford v. Saul*, 950 F.3d 1141, 1155 (9th Cir. 2020) (recognizing that "an opinion cannot be rejected merely for being expressed as answers to a check-the-box questionnaire" but agreeing that an opinion "lacked explanation" and noting that the questionnaire asked the treating physician to "explain why [the claimant] met the criteria of [listed impairments], which require[d] specific medical diagnoses," and he "wrote only,

---

[9] These examples lend further support to a ground on which the ALJ relied. *See Fenton v. Colvin*, No. 6:14-cv-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) (noting that a court is "not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but [it] . . . is permitted to consider additional support for a ground on which the ALJ relied" (citing *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1005 n.3 (9th Cir. 2006))). It is also noteworthy that NP Jacobs failed to explain the extent to which the physical limitations that she identified stemmed from "emotional factors" and Plaintiff's "psychological conditions" because NP Jacobs' May 2024 opinion cites these as contributors to Plaintiff's overall "symptoms," "functional limitations," and "physical condition" (Tr. 2047), and because in this appeal, Plaintiff does not challenge the ALJ's "mental RFC findings," which the ALJ derived from his evaluation of the record evidence and testimony concerning Plaintiff's mental impairments. (*See* Pl.'s Opening Br. at 8 n.10, electing not to summarize opinions regarding mental impairments for this reason).

PAGE 19 – OPINION AND ORDER

'[c]ondition is permanent,' which [did] not explain the basis for [his] conclusion" (citing *Popa v. Berryhill*, 872 F.3d 901, 907 (9th Cir. 2017))).

The ALJ also discounted NP Jacobs' opinions based on internal inconsistencies regarding Plaintiff's ability to walk and the medical necessity of the cane that Plaintiff used. (Tr. 37.) In support, the ALJ explained that NP Jacobs initially opined that Plaintiff "needed a cane to ambulate," but later reported only that Plaintiff "used a cane on occasion of flare ups." (*Id.*; *cf. id.* at 1382, 2048, setting forth NP Jacobs' respective responses to questions 7.A.5. and 15.H.) An ALJ may discount an opinion (or a claimant's symptom testimony) based on conflicting evidence regarding the medical necessity of an "assistive device." *See Frazier v. Busignano*, No. 24-4621, 2025 WL 2388876, at *1 (9th Cir. Aug. 18, 2025) (holding that substantial evidence supported the ALJ's finding that the claimant's two physician assistants' "opinions were inconsistent with . . . their own notes and other treatment records, which indicated that [the claimant] . . . did not require the use of an assistive device"); *see also Palmer v. O'Malley*, No. 22-16448, 2024 WL 1904347, at *1 (9th Cir. May 1, 2024) (holding that the ALJ provided "specific, clear, and convincing reasons for rejecting [the claimant's] testimony about the degree of her impairments, including [her] inconsistent use of an ambulatory aid"); *Bostwick v. Berryhill*, 677 F. App'x 344, 345 (9th Cir. 2017) (holding that the ALJ did not err in determining that the claimant's "testimony was inconsistent with the lack of evidence that she needed a hand-held assistive device to walk").

Plaintiff argues that the flaw in the ALJ's logic is "patently obvious" because there is no conflict between NP Jacobs' opinions that she "needs an assistive device" and "only needs it during flareups." (Pl.'s Opening Br. at 15, citing Tr. 37-38.) This description fails accurately to capture NP Jacobs' opinions.

PAGE 20 – OPINION AND ORDER

In her April 2023 opinion, NP Jacobs answered questions that were premised on the assumption Plaintiff had been "placed in a competitive work situation on an ongoing basis" and required NP Jacobs to estimate Plaintiff's "functional limitations," including her "ability to 'ambulate effectively' . . . on a sustained basis without companion assistance[.]" (Tr. at 1382.) NP Jacobs opined that Plaintiff could only shop for "grocer[ies] and clothes" for a "short time" without companion assistance and could not "walk a block at a reasonable pace on rough or uneven surfaces," "use standard public transportation including climbing into/out of a bus and tolerat[ing] the typical jostling on a bus," or "climb several stairs at a reasonable pace with use of only a single handrail[.]" (*Id.*; *but cf. id.* at 1920, reflecting that less than a year later, NP Jacobs recommended that Plaintiff perform ten minutes of "increased activity three times a day" and described "walking up and down stairs" as one of the potential ways in which Plaintiff could do so). Immediately after providing these responses, NP Jacobs answered (1) "[y]es" to the question of whether Plaintiff "need[ed] an assistive device to ambulate," and (2) "uses a cane" to the follow-up question asking NP Jacobs to identify the "type of assistive device" that Plaintiff used. (*Id.* at 1382.)

In her May 2024 opinion, by contrast, NP Jacobs declined to answer "[y]es" or "[n]o" to the question of whether Plaintiff "must . . . use a cane or other assistive device[.]" (*Id.* at 2048.) Instead, she simply noted in a blank space that Plaintiff "uses a cane on occasion of flare ups[.]" (*Id.*)

It was reasonable for the ALJ to interpret NP Jacobs' answers to these questions as internally inconsistent. Unlike her May 2024 opinion, NP Jacobs' April 2023 opinion suggests that Plaintiff's cane is a medical necessity and Plaintiff cannot sustain competitive work without

PAGE 21 – OPINION AND ORDER

companion assistance. Thus, the Court rejects Plaintiff's argument that the ALJ's finding is based on flawed logic.

In addition to the reasons above, the ALJ also discounted NP Jacobs' opinions because she is a "general practitioner and not a relevant specialist" (i.e., connective tissue disorders, etc.). (*See id.* at 38; *cf. id.* at 1380, completing a "Connective Tissue Disorder Medical Assessment Form") (simplified). Plaintiff agrees that "specialty" is a permissible consideration under the revised regulations but argues that it should not outweigh NP Jacobs' "treating relationship" and that the ALJ erred by failing to "consider[]" this relationship in evaluating NP Jacobs' opinions. (Pl.'s Opening Br. at 16.)

The ALJ did not err here. Unlike other medical providers, the ALJ identified NP Jacobs multiple times as Plaintiff's "primary care provider." (Tr. at 24, 31, 37.) Further, and as Plaintiff agrees, the ALJ was entitled to consider her specialization. *See* 20 C.F.R. § 416.920c(c)(4) ("The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty."). Case law is also in accord. *See, e.g.*, *Shaughnessy v. Kijakazi*, No. 21-16402, 2022 WL 4093740, at *2 (9th Cir. Sep. 7, 2022) (holding that substantial evidence supported the ALJ's decision to discount the claimant's treating physician's opinion, including because the "physician was not a specialist").

Finally, the Court notes that the ALJ also "addressed consistency . . . by reviewing the opinions of the other medical [consultants]—none of whom reached the same conclusion" or identified the same degree of limitation as NP Jacobs. *See Morrow v. Bisignano*, No. 24-3711,

PAGE 22 – OPINION AND ORDER

2025 WL 1924900, at *1 (9th Cir. July 14, 2025) (holding that substantial evidence supported a similar finding); (*cf.* Tr. 36-38, reflecting that unlike NP Jacobs, the ALJ found that the state agency medical consultants' opinions were "partially persuasive" and "generally consistent with the overall record, including the imaging studies, physical examination findings, and treatment history discussed earlier").

In summary, substantial evidence supports the ALJ's discounting of NP Jacobs' medical opinions, which the ALJ evaluated in accordance with the revised regulations and controlling precedent.

## III.    SYMPTOM TESTIMONY

### A.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison*, 759 F.3d at 1014 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)).

### B.    Analysis

There is no evidence of malingering here and the ALJ determined that Plaintiff provided objective medical evidence of underlying impairments which might reasonably produce the symptoms alleged. (*See* Tr. 28, reflecting that the ALJ found that Plaintiff's "medically

PAGE 23 – OPINION AND ORDER

determinable impairments could reasonably be expected to cause the alleged symptoms"). The ALJ was therefore required to provide clear and convincing reasons for discounting Plaintiff's symptom testimony. *See Ghanim*, 763 F.3d at 1163. The Court concludes that the ALJ met that standard here.

### 1.     Mental Impairments

It is important to consider at the outset that Plaintiff does not challenge the specific reasons that the ALJ provided for discounting Plaintiff's testimony about the alleged intensity, persistence, and limiting effects of her mental impairments. (*See* Tr. 28, 34-36, identifying the start of the ALJ's subjective symptom analysis and point at which the ALJ turned to Plaintiff's testimony and record evidence regarding her "mental impairments"; Pl.'s Opening Br. at 8 n.10, declining to summarize "opinions related to psychiatric impairments" because "Plaintiff does not challenge the ALJ's mental RFC finding" in this appeal; *see also* Tr. 168, 178, confirming that in her application for benefits, Plaintiff alleged disability based in part on her mental health impairments). Given Plaintiff's representation, the Commissioner focuses only on the ALJ's analysis of Plaintiff's physical impairments and argues that Plaintiff forfeited any challenge to the ALJ's analysis concerning her mental impairments and related limitations. (Def.'s Br. at 1 n.1, 4 n.4.)

The Court agrees that Plaintiff forfeited any challenge to the identified portion of the ALJ's subjective symptom analysis and therefore limits its review to the ALJ's evaluation of Plaintiff's testimony regarding her physical impairments. *See Nadon v. Bisignano*, 145 F.4th 1133, 1136-37 (9th Cir. 2025) ("[T]he ALJ provided other reasons for discounting the various healthcare professionals' opinions[.] . . . Because [the claimant] failed to . . . challenge the ALJ's reliance on them, the Commissioner was correct to assert that [the claimant] forfeited the argument that the ALJ did not provide sufficient reasons for discounting the opinions of the

PAGE 24 – OPINION AND ORDER

healthcare professionals." (citing *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008))); *Cody v. Bisignano*, No. 25-3837, 2026 WL 1470573, at *1 (9th Cir. May 26, 2026) (declining to consider "contentions regarding [a physician's] opinion" because the claimant failed to "address the ALJ's primary reason" for discounting it (citing *Nadon*, 145 F.4th at 1138)).

### 2.     Physical Impairments

The ALJ provided several specific, clear, and convincing reasons for discounting Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her physical impairments.[10]

The ALJ discounted Plaintiff's testimony based in part on record evidence demonstrating that her treatment was "reasonably effective in managing her symptoms, as reflected in her statements to her providers about getting good relief from her injections and therapy[.]" (Tr. 34, citing Exs. B2F at 30-31, B4F at 29, 52, B6F at 7, B9F at 15, 29, 47, B10F at 22, 50, i.e., Tr. 443-44, 1182, 1205, 1278, 1340, 1398, 1412, 1430, 1906, 1934.) The ALJ concluded that this evidence and other record evidence undermined Plaintiff's "allegations of disabling physical symptoms and limitations." (*Id.* at 34, finding that the overall record undermined such allegations).

It is well established that "evidence of medical treatment successfully relieving symptoms can undermine a claim of disability." *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017) (citing 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1)); *see also Warre*, 439 F.3d at

---

[10] In challenging the ALJ's analysis of Plaintiff's testimony regarding her physical impairments, Plaintiff repeats her arguments that the ALJ's statements are too conclusory to permit meaningful review and include lay assessments of medical evidence. (Pl.'s Opening Br. at 16-17.) The Court rejects these arguments for the reasons described above. *See supra* Parts I & II.B.3.

1006 (stating that "[i]mpairments that can be controlled effectively with [treatment] are not disabling for the purpose of determining eligibility for SSI benefits") (simplified). In evaluating whether the ALJ appropriately discounted Plaintiff's testimony on this ground, the question is whether the ALJ's rationale is "clear enough that it has the power to convince." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022) ("The standard isn't whether [a reviewing] court is convinced, but instead whether the ALJ's rationale is clear enough that it has the power to convince. Here, it does: the ALJ cited specific, clear, and convincing examples across a multi-year period contrasting [the claimant's] subjective pain testimony with objective medical evidence.").

Plaintiff argues that the ALJ erred in relying on evidence that she improved with treatment because the ALJ failed adequately to account for her impairments often being accompanied by "good days and bad days." (Pl.'s Opening Br. at 17.) In other words, Plaintiff argues that contrary to the ALJ's finding, her physical symptoms "wax and wane" and result in "[c]ycles of improvement and debilitating symptoms[.]" (*Id.*, quoting *Garrison*, 759 F.3d at 1017-18.)

Plaintiff's argument about having "good days and bad days" depends largely on NP Jacobs' opinions, which, as discussed above, the ALJ appropriately discounted. (*See* Tr. 1383, 2048, reflecting that NP Jacobs stated without explanation that Plaintiff's "impairments [are] likely to produce 'good days' and 'bad days'" and that Plaintiff's performance of full-time work would "create many 'bad days'" and contribute to her exceeding employers' customary tolerances for absences; *see also id.* at 102, addressing customary tolerances during Plaintiff's initial administrative hearing).

///

PAGE 26 – OPINION AND ORDER

Even if that were not the case, the Court concludes that the ALJ's rationale and supporting examples were convincing. (*See id.* at 1339-40, April 10, 2023, indicating that Plaintiff described her pain as "manageable" and stated that she was "getting good relief" from her treatment, including "75% relief" and greater than "60% relief" in pain; *id.* at 1430, May 31, 2023, noting that Plaintiff rated her pain a two on a ten-point scale before receiving a medial branch block injection and a zero out of ten afterwards; *id.* at 1398, September 1, 2023, stating that Plaintiff rated her pain as three out of ten and reported that her treatment provided "75% relief in pain for about [three] months"; *id.* at 1934, November 14, 2023, reflecting that Plaintiff rated her pain as a five out of ten before a medial branch radiofrequency coagulation ("RFC") procedure and a zero out of ten afterwards; *id.* at 1902, 1906, February 20, 2024, demonstrating that Plaintiff rated her pain as a three out of ten and reported that after her "helpful" RFC procedure in November 2023, she achieved "75% relief in pain for about [three] months" and that Plaintiff's provider cited "more than [six] months of therapeutic relief" from injections).[11]

Given these facts and authorities, the Court finds that the ALJ appropriately discounted Plaintiff's testimony based on evidence that her symptoms improved with treatment. *See Floe,* 2024 WL 4601594, at *1 (holding that "[t]he ALJ . . . properly noted that [the claimant's] symptoms improved with medication and treatment, concluding that such evidence undermined [the claimant's] statements about the severity of his impairments" (citing *Wellington,* 878 F.3d at 876)).

---

[11] During the June 13, 2024 hearing, Plaintiff testified that her insurer recently denied coverage for "nerve ablations and the injections" but her treating provider was "fighting the denial" and informed her that the insurer should not have denied coverage, all of which appears consistent with Plaintiff's treatment history. (Tr. 122; *cf. id.* at 1898-99, 1902, 1906, February 20, 2024, noting that Plaintiff presented for a post-procedure follow up and listing Plaintiff's history of at least one medial branch block or ablation procedure during the preceding five-year period). Nothing in the record indicates that Plaintiff's provider was unable to resolve this coverage issue.

PAGE 27 – OPINION AND ORDER

The ALJ also discounted Plaintiff's testimony on the ground that her "treatment has thus far been essentially conservative in nature" and consisted "principally of medication, injections, and occupational/physical therapy" and included "recommend[ations]" to maintain an "active lifestyle with regular aerobic exercise[.]" (Tr. 34, citing Exs. B1F at 2, B9F at 57, i.e., Tr. 411, 1440.) "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (simplified).

Plaintiff argues that the ALJ erred in rejecting her testimony on this ground because "pain medication injections and ablation treatments are not 'conversative' treatments, [as] they are invasive." (Pl.'s Opening Br. at 18, citing *Garrison*, 759 F.3d at 1015 n.20); *see also Garrison*, 759 F.3d at 1015 n.20 ("In any event, we doubt that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment."); *cf. Macina*, 2024 WL 5116300, at *3 (expressing "[n]o doubt" that "pain medication and epidural injections" are "not always conversative" but explaining that they were the "conservative option to surgery" in that case, "[w]hether a treatment is conservative is an assessment relative to the affliction and other available treatments," "pain management rather than surgery [was] conservative treatment," and "choosing conservative treatment clashes with the limitations [that the treating physician] describe[d]").

In *Garrison*, the Ninth Circuit expressed doubt that the pain medications and epidural steroid injections at issue were "conservative" treatment, but it did not address ablation procedures. *See* 759 F.3d at 1015 n.20. Contrary to Plaintiff's argument, several courts have described ablation procedures as minimally invasive. *See Wright v. Kijakazi*, No. 20-2715, 2021 WL 3832347, at *1 (7th Cir. 2021) (noting that the claimant "received various treatments for her

PAGE 28 – OPINION AND ORDER

back pain, including radiofrequency denervation (a minimally invasive procedure)"); *Radford v. Comm'r of Soc. Sec. Admin.*, No. 24-cv-03373, 2025 WL 4218587, at \*3-5 (D. Ariz. June 26, 2025) (affirming the ALJ's discounting of medical opinions related to "hypermobility syndrome" and explaining that the "pain-management procedures" upon which the claimant relied were "relatively routine . . . operations consisting of minimally invasive radiofrequency ablations and palliative injections"); *Beach v. Saul*, No. 19-cv-01179, 2020 WL 4336068, at \*5 n.7 (S.D. Cal. July 28, 2020) ("Radiofrequency ablation . . . is a nonsurgical, minimally invasive procedure that uses heat to reduce or stop the transmission of pain. Radiofrequency waves ablate, or burn, the nerve that is causing the pain, essentially eliminating the transmission of pain signals to the brain.") (citation omitted), *aff'd on other grounds*, 846 F. App'x 434, 434-35 (9th Cir. 2021).

Also significant is that Plaintiff fails to address the ALJ's reliance on medical providers' recommendations that she engage in physical therapy, maintain an active lifestyle, and increase her daily exercise. (*See* Tr. 411, March 7, 2022, noting that Plaintiff presented for a "genetics evaluation pertaining to connective tissue related concerns" and Plaintiff's examining physician explained that individuals who suffer from "hypermobility need to have an active lifestyle with at least [twenty] minutes of exercise a day, and should try to keep their weight in a normal range" and "[e]xercise should be low impact such as walking, cycling or swimming"; *id.* at 1440, April 28, 2023, reflecting that NP Jacobs reported that Plaintiff's "symptoms need to be managed by persistent and consistent lifestyle changes," NP Jacobs' "most important lifestyle recommendation" was "[r]egular aerobic exercise . . . by far," and NP Jacobs explained that individuals who suffer from "hypermobility should exercise [twenty] minutes a day at least," "[m]any people find that they feel better if they are able to stay active," "[e]xercise to maintain muscle tone and strength [was] important to reduce . . . long-term chronic pain, but the exercise

PAGE 29 – OPINION AND ORDER

should not stress joints," helpful activities "include[d] walking, cycling and swimming" and using "[e]xercise equipment such as elliptical machines," and "[o]ther treatments can include physical therapy especially for those with gross motor delays or persistent pain"; *see also id.* at 1920, January 9, 2024, stating that NP Jacobs recommended that Plaintiff perform ten minutes of "increased activity three times a day" and described "walking up and down stairs" as one of the potential ways to increase activity).

On this record, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff's conservative treatment undermined her testimony as to the severity of her physical impairments. Circuit precedent supports this conclusion. *See, e.g.*, *Smarrt*, 53 F.4th at 500 ("After [the claimant's] surgery, the ALJ cited documented evidence of 'conservative treatment,' including physical therapy, temporary use of a neck brace and wheelchair, and ongoing pain medication. As a result of these measures, the record shows both self-reported and objective improvement. The ALJ did not err in concluding that such ongoing conservative treatment and overall improvement are inconsistent with [the claimant's] testimony as to the severity of her impairments."); *see also Tristan v. Berryhill*, 752 F. App'x 516, 517 (9th Cir. 2019) ("The ALJ provided clear and convincing reasons to discredit [the claimant's] testimony as to extreme limitations resulting from pain[,] . . . [including] lack of support from relatively mild clinical findings."); *Waltrip v. Saul*, 843 F. App'x 962, 963 (9th Cir. 2021) (holding that the ALJ properly relied on evidence that "doctors had recommended conservative treatment such as diet and exercise changes").

The ALJ also discounted Plaintiff's testimony because it was "not fully consistent" with her providers' "objective findings" and her hearing testimony exceeded any reports that her providers documented in her records. (*See* Tr. at 34, making these findings and noting that

PAGE 30 – OPINION AND ORDER

Plaintiff "made little, if any, mention to her pain clinic providers of pain at such an intensity that she could not even lift a hand to wipe her tears[,] as she testified to at the hearing"; *cf. id.* at 113, reflecting that Plaintiff testified at the hearing before the ALJ that her pain causes her to lie on her "back in [a] recliner, unable to push any further, staring up at the ceiling, unmoving, [with] tears running down [her] face that [she is] unable to wipe away"). These reasons lend further support to the ALJ's discounting of Plaintiff's testimony as to the severity of her physical impairments. *See Smarrt*, 53 F.4th at 498 ("When objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony."); *see also id.* (stating that the claimant "incorrectly read[] the ALJ's 'not entirely consistent' language" as "penaliz[ing] her for not providing objective medical evidence fully corroborating the severity of her self-reported symptoms" but the "context of the ALJ's decision as a whole," including "several inconsistencies" that it identified, revealed that the "correct reading" was that the ALJ discounted the claimant's testimony based on "conflicting evidence").

In summary, the Court concludes that the ALJ provided specific, clear, and convincing reasons, supported by substantial evidence in the record, for discounting Plaintiff's symptom testimony.[12]

///

///

///

---

[12] Plaintiff also suggests that the VE hypothetical that the ALJ derived from his RFC was defective because it failed adequately to account for her credible work-related limitations. (Pl.'s Opening Br. at 4.) This argument depends on Plaintiff's challenges to the ALJ's evaluation of her symptom testimony and NP Jacobs' opinions (*see id.* at 4-19) and thus fails for the same reasons.

PAGE 31 – OPINION AND ORDER

## CONCLUSION

For the reasons stated, Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence in the record.

**IT IS SO ORDERED.**

DATED this 8th day of June, 2026.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge